UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

AQUEL WASEF,

Defendant.

Case No.: 3:18-cr-01483-GPC

**ORDER:**

**(1) DENYING MOTION TO SUPPRESS (ECF No. 14); and**

**(2) FINDING DEFENDANT NOT GUILTY OF COUNTS ONE THROUGH EIGHT OF THE INDICTMENT (ECF No. 1)**

On March 20, 2018, a grand jury returned an indictment charging Defendant Aquel Wasef with eight counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). (ECF No. 1.) Wasaf waived his right to a jury trial and the Court commenced a bench trial on June 4, 2018. (ECF No. 15.) The day before trial began, Wasef filed a motion to suppress evidence obtained on the morning of his arrest, including items found on his person and in a vehicle he had recently occupied as well as statements he made to police officers. (ECF No. 14-1.) The Court considered the motion to suppress based on the evidence presented at the two-day trial. At the second day of trial on June 13, 2018, the government offered further testimony—to which Defendant

1

did not object—in opposition to Defendant's suppression motion. (ECF No. 18.)

For the reasons set forth below, the Court DENIES Defendant's motion to suppress. It nonetheless finds Wasef NOT GUILTY of all eight counts in the indictment.

## I.    Motion to Suppress

### A. Evidence

At trial, the government offered the testimony of four witnesses: (1) San Diego Police Officer Heather Seddon, (2) former San Diego Police Office Brian Howard, (3) San Diego Police Officer Yusuf Smith, and (4) victim J.N.[1]  Khatera Wasef, Defendant Wasef's wife, testified as Defendant Wasef's only witness.

#### i.  Government's Evidence

##### a.  Officer Seddon

Heather Seddon is a police officer with the San Diego Police Department. (Trial Tr. at 20.) On December 12, 2016, Seddon was working the "graveyard shift," which runs from 9:00 p.m. to 7:00 a.m. (*Id.* at 22–23.) Seddon was serving as Acting Sergeant, overseeing officers for the night. (*Id.* at 23.) Early that morning, Seddon received "a radio call of a vehicle caser in the area of 5500 Clairemont Mesa Boulevard," a location with multi-level apartment complexes and adjoining parking lots. (*Id.* at 23–24.) By the time Seddon arrived, one or two officers were already present at the scene. (*Id.* at 24.) Seddon and another officer soon came upon two individuals sitting in one of the vehicles in the parking lot. (*Id.* at 25.) After removing the two individuals from the subject vehicle, the officers determined that neither individual was the registered owner. (*Id.* at 25, 35) Seddon instructed the other officer to contact the registered owner. (*Id.* at 25.)

While the other officer was attempting to contact the registered owner of the vehicle, Seddon and another officer identified the two occupants as Wasef and Aliyar Hoshang. (*Id.* at 26.) The officers handcuffed Wasef. (*Id.* at 34.) The officers

---

[1] The Court uses J.N.'s and all other victims' initials to protect their identity in light of their current vulnerability to identity theft.

2

eventually placed both individuals under arrest "for possession of a stolen vehicle." (*Id.*) Officer Brian Howard then searched the vehicle. (*Id.*)

The police radio-call report (the "CAD Report") for the morning of December 12, 2016,[2] indicates that the first dispatch involving this incident was made at 3:44 a.m. After reviewing the CAD Report, Seddon testified that she was dispatched to the scene at 4:21 a.m. and arrived at 4:29 a.m. (*Id.* at 30.) The officers removed Wasef from the vehicle between a "minute or two" and "five to ten minutes" after Seddon arrived on the scene. (*Id.* at 33.) According to the CAD Report, at 4:52 a.m. Seddon asked the dispatcher to have the Chula Vista Police Department to contact the registered owner of the vehicle (the vehicle was registered in Chula Vista). (*Id.* at 31.) At that point, there was no information suggesting that the vehicle had been stolen. (*Id.*) The CAD Report indicates that at 5:17 a.m. the officers received word that, while the owner had not reported the vehicle as stolen, the owner had indicated to the officers that contacted him that the subject vehicle was stolen. (*Id.* at 31–32.)

Officer Seddon testified that when she encounters a potential stolen vehicle that is occupied by an individual, she usually will not arrest the individual immediately, but will instead detain the occupant in handcuffs "based on the potential for weapons" in the vicinity. (*Id.* at 21.) She will then search the vehicle. (*Id.* at 21–22.) If she confirms that the vehicle is stolen, Seddon will "reach out to the registered owner," and if the vehicle is drivable, she will request that the registered owner come to the scene and pick up the vehicle. (*Id.* at 22.) If the registered owner is not available to retrieve the vehicle, the officers will impound the vehicle. (*Id.*)

On the second hearing date, the government recalled Officer Seddon to offer further testimony about her department's arrest and impounding procedures. Seddon first explained that she made the decision to arrest Wasef because he was in possession of a

---

[2] This report was admitted as Defense Exhibit A. (*Id.* at 30.)

stolen vehicle. (Trial Tr. at 122.) Seddon also testified about the San Diego Police Department's procedure for arresting individuals. She explained that officers engage in an "inventory-type search" of the contents of arrestees' pockets. (*Id.* at 123.) Seddon also recounted that the subject vehicle was impounded and its contents were inventoried. (*Id.*) The purpose of the inventory search, according to Seddon, is to find evidence related to the vehicle theft crime; to render the vehicle safe by removing all weapons; and to ensure that anything of value is documented and preserved. (*Id.* at 124.) As part of that search, the officers inventoried the contents of a black bag found inside the vehicle. (*Id.* at 126–27.)

### b. Officer Howard

On December 12, 2016, Brian Howard was serving as a Police Officer for the San Diego Police Department and was assigned to the day shift. (Trial Tr. at 36–37, 40.) Immediately after roll call, Howard was sent to assist with the scene at issue in this case; Howard arrived around 5:14 a.m. (*Id.* at 40, 55.) By the time Howard arrived others officers had already detained Wasef and Hoshang. (*Id.* at 41.) At that point, the vehicle at issue had not yet been reported as stolen. (*Id.* at 42.)

Howard was tasked with contacting the registered owner of the vehicle, Fadi Saadedin, by telephone. (*Id.* at 41, 43.) Saadedin told Howard that several days earlier, Saadedin had tried to report the vehicle as stolen after lending the vehicle to an individual named David Mosa, but the Sheriff's Department "didn't actually take a report that day because they said he needed to go to the post office to retrieve something. So it was never actually reported stolen." (*Id.* at 41–42, 55.) Saadedin also told Howard that Mosa had recently contacted Saadedin to tell him that Mosa would bring the vehicle back by "nine o'clock that day," so Saadedin considered the vehicle to still be "on loan" to Mosa. (*Id.* at 56.) Saadedin told Howard that Saadedin did not give Wasef or Hoshang permission to use his vehicle. (*Id.* at 43–44.)

After speaking with Saadedin, Howard searched the vehicle. (*Id.* at 44.) By the time Howard began his search—which was at least fifteen minutes after Howard's arrival

at the scene—Wasef had been taken to the police station. (*Id.* at 57, 59.) Howard did not know if, prior to his search, anyone had searched or taken any items out of the vehicle. (*Id.* at 57.)

Inside the vehicle Howard found a box with "computer-type equipment" that was addressed to the apartment complex adjoining the parking lot.[3] (*Id.* at 44–45.) He also found a black bag in the back seat, which contained "paperwork consisting of mail and personal identifiable information" corresponding to multiple different individuals. (*Id.* at 45–46.) Among the paperwork was a Bank of America check, number 3756, dated October 19, 2016, made out to Aquel Wasef from Ramona High School, and in the amount of $792.36.[4] (*Id.* at 47.) On the back of the check was a signature, thumbprint, a phone number, and a social security number. (*Id.* at 48.) The phone number belonged to Mosa. (*Id.* at 47, 58.) Also inside the bag was a torn segment of a paycheck issued by the University of Vermont Medical Center to an individual with the initials T.N. for the amount of $1,547.82.[5] (*Id.* at 49–50; *see also id.* at 62 (describing the condition of the check as "torn up").) A significant portion of the top-left quadrant of the paycheck was missing. Neither Wasef's nor Hoshang's name was found on the paycheck. (*Id.* at 50–51.) Around 8:35 a.m.—after Howard completed his search—the officers requested a tow vehicle, and Saadedin's vehicle was later impounded. (*Id.* at 54, 65.)

Officer Howard testified that when he suspects that he has encountered a stolen vehicle, he first determines whether the occupants are allowed to be in possession of the vehicle by asking the occupants if they know the owner or have the owner's phone number. (*Id.* at 37–38.) He then calls the vehicle owner and determines whether the occupants have permission to be in possession of the vehicle. (*Id.* at 38.) If he determines that the vehicle is stolen, he searches it for "certain pieces of evidence" such

---

[3] As far as Howard knew, no one has searched the contents of the computer equipment. (*Id.* at 63.)
[4] This check was admitted as Government's Exhibit 2. (*Id.* at 46–47.)
[5] This paycheck was admitted as Government's Exhibit 3. (*Id.* at 49.)

as a "shaved key" or "punched steering column," or property belonging to the occupant or owner. (*Id.*) After the search is conducted, the officers will either tow the vehicle or wait for the owner to come to the scene and retrieve the vehicle. (*Id.* 39.)

### c. Officer Smith

On the morning of December 12, 2016, San Diego Police Officer Yusuf Smith was working the graveyard patrol shift. (*Id.* at 69.) Smith and an Officer Casciola were dispatched to the scene at issue; upon arriving, they saw Seddon detaining Wasef. (*Id.* at 70–71; 82.) Smith took custody of Wasef from Seddon and within minutes put Wasef in handcuffs. (*Id.* at 71, 83–84.) Smith stated that he put Wasef in handcuffs because Wasef matched the description of the person casing vehicles in the area. (*Id.*)

Smith asked Wasef if he had identification. (*Id.* at 72.) According to Smith's testimony, Wasef reached for his back pocket, to which Smith told Wasef not to reach for anything, but instead to tell Smith where the identification was. (*Id.*) In response, Wasef "put out his right buttocks, where his pocket is, and said it's inside his pocket." (*Id.*) Smith then reached into Wasef's back pocket. (*Id.*) Smith took out of that pocket "numerous cards," none of which had Wasef's information, other than his daughter's passport card. (*Id.*) Smith then noticed cards in Wasef's left breast shirt pocket. (*Id.*) He did not obtain consent to search that pocket; rather, he searched it "looking for identification of Mr. Wasef." (*Id.* at 86.) From that pocket, Smith retrieved a stack of cards.[6] (*Id.* at 73.) One of the cards in this stack was a California driver's license for J.N.[7] (*Id.* at 73–74.) Also in the stack were several credit cards with J.N.'s name,[8] as well as a Johnson & Johnson DePuy card, a Costco membership card, a Sharp card, and an AAA card, all with J.N.'s name on them. (*Id.* at 74–75.) Also in the stack was a

---

[6] The contents of this stack was admitted as Government's Exhibit 4A.

[7] The driver's license, which was admitted within Government's Exhibit 4A, was marked as Government's Exhibit 4. (*Id.* at 74.)

[8] These cards included a MasterCard (Exhibit 5), an Alaska Airlines Visa Signature Card (Exhibit 6), a Southwest Visa Signature Card (Exhibit 7), and a Wells Fargo Visa Debit Card (Exhibit 8). (*Id.* at 74–75.)

Discover credit card belonging to an individual with the initials S.V.[9]  (*Id.*)

Smith testified that Wasef told Smith that the bag belonged to him.  (*Id.* at 84.)  Upon reviewing his report,[10] however, Smith conceded that Wasef did not tell Smith that the bag belonged to him.  (*Id.* at 85.)  According to Smith's report, Wasef stated: "I do not have any black bag or any other property other than a green shirt and phone in the car."  Prior to that statement, however, Smith wrote in his report that "There was a black back belonging to Wasef in the trunk of the vehicle he was sitting in prior to police arrival."  (*See id.* at 88.)  Smith reached this conclusion because Smith found in the black bag a residential lease with Wasef's name on it.  (*Id.* at 89.)  Smith agreed during cross-examination that Hoshang also could have had access to the black bag.  (*Id.* at 91.)

After sorting through the cards found in Wasef's shirt, Smith searched the vehicle.  (*Id.* at 77.)  Before doing so, and despite knowing that the vehicle was not Wasef's, Smith asked Wasef if the officers could search the car, to which Wasef said "go ahead."  (*Id.* at 79.)  Smith went through every item in the black bag.  (*Id.* at 77–78.)  He collected the contents as evidence, and turned them over to Officer Howard, who impounded them; and Detective Slater and Acting Detective Sarah Sutter were later made responsible for the bag and its contents.  (*Id.* at 78.)

### d.  J.N.

J.N. is a resident of the North Clairemont neighborhood of San Diego.  (*Id.* at 93.)  Her residence is about six or seven blocks from where Wasef was detained.  (*Id.* at 94.)  On New Year's Day 2016, several of J.N.'s possessions were taken from the trunk of her car including a billfold, her identification, credit cards, and cash.  (*Id.* at 94–95.)  She canceled the credit cards the same day.  (*Id.*)  Prior to her cancelling the cards, however, someone made charges on at least one of the cards.  (*Id.*)

J.N. identified the cards that Officer Smith found in Wasef's shirt pocket as items

---

[9] This card was admitted as Government's Exhibit 9.  (*Id.* at 76.)
[10] Smith's report was admitted as Defendant's Exhibit C.  (*Id.* at 86.)

stolen from her trunk. (*Id.* at 95–98.) J.N. did not know who Wasef was until she was contacted by law enforcement following Wasef's arrest. (*Id.* at 99–100.)

### ii. Defendant's Evidence

#### a. Khetera Wasef

Khatera Wasef has been married to Defendant Wasef for seven years. (*Id.* at 109–10.) In December 2016 their family was living in an apartment in Spring Valley, and Defendant Wasef was working at Toyota Kearny Mesa. (*Id.* at 110.) When asked if around that time Defendant Wasef ever stored "a lot of documents or papers in the house," Khatera Wasef responded no. (*Id.* at 111.) In November 2016, Khatera and Defendant Wasef got into an argument after Defendant Wasef failed to come home for the night. (*Id.* at 111–12.) During the argument, Defendant Wasef hit Khatera. (*Id.* at 112.) Khatera told Defendant Wasef to leave the house and then obtained a restraining order against him. (*Id.*)

### iii. Stipulated Evidence

#### a. Valetta Guthrie

The parties entered a stipulation stating the following.[11] Valetta Guthrie is an Account Technician III in the Finance Department at Ramona High School. According to Guthrie, the routing and account numbers on the Ramona High School check found in Wasef's possession were valid, but unlike the check number on the check made out to Wasef—which had four digits—Ramona High School's checks have five-digit numbers. Guthrie found a check number 36523 in her records, which was issued to "Buddy's All-Stars" on October 29, 2015. Guthrie did not find any transactions between Ramona High School and Wasef. According to Guthrie, vendors must be approved for a check to be issued to them; Wasef is not listed as a past or current vendor with Ramona High School. ///

---

[11] This stipulation was admitted as Government's Exhibit 19.

### b. Officer Body Camera Videos

The parties offered into evidence two officer body camera videos. The first is from Officer Seddon's perspective. At the beginning of the video, Seddon and another officer ("Officer 2") are shining their flashlights into the windshield of a vehicle. Officer 2 indicates that there are two men inside the vehicle. The officers order the men to show their hands. Seddon then orders Wasef, who is sitting in the driver's seat, out of the vehicle. About two minutes in, another officer arrives and Seddon hands Wasef to the officer. The Court concludes that the officer is Officer Smith in light of Officer Smith and Seddon's testimony. Seddon then assists Officer 2 in removing Hoshang from the passenger seat. The officers handcuff Hoshang. A fourth officer, standing behind Smith ("Officer 4"), appears in the frame about three minutes into the video. Seddon asks Wasef and Hoshang whether they have identification. Hoshang says no. About three minutes and 45 seconds into the video, one can see Smith reaching into Wasef's back-right pant pocket. About fifteen seconds later, Seddon asks Hoshang who owns the vehicle, and Hoshang responds "I believe my cousin." About five minutes in, a patrol vehicle pulls behind Hoshang and the officers, and the officers place Hoshang in the back of the patrol vehicle.

The second video is from the perspective of Officer Smith. It begins with Wasef already handcuffed. Smith is reaching into Wasef's back-right pant pocket and pulls out several cards and a piece of paper that appears to be a check. For the first thirty seconds of the video, there is no audio. Once the audio begins, one can hear Smith ask Wasef where he lives and Wasef answers that he has been kicked out of his apartment. Meanwhile, Smith pulls more cards out of what appears to be Wasef's back-left pocket, and then checks both of Wasef's front pockets. Smith places the cards he has found on the front of the subject vehicle. Smith uses one of the cards to retrieve Wasef's name. For the next three minutes, Smith asks Wasef several biographical questions to which Wasef responds cooperatively. Four minutes and fifty seconds in, another officer asks Wasef who owns the vehicle. Wasef says that a friend of his rented the vehicle. Wasef

then says that he drove the vehicle from a Motel Six to its current location. The officer asks Wasef whom he borrowed the car from, and Wasef says he did not borrow the car from anyone, but rather that someone asked Wasef to give him a ride to the vehicle's current location. The officer says "I'm a little confused." At that point—about five minutes and forty seconds into the video—Smith reaches into the left breast pocket of Wasef's shirt and retrieves a stack of cards. Smith asks Wasef whom the cards belong to; Wasef responds that the cards were in the vehicle. Approximately six minutes and thirty seconds in, Smith asks another officer if the vehicle had "come back with" a registered owner, and the officer responds that the owner is from Chula Vista. For the next five minutes, Smith sifts through the cards he has collected from Wasef. About eleven minutes in, Smith places Wasef into the back of a patrol vehicle.

### B. Analysis

Defendant argues that the Court should suppress the evidence found in (1) Wasef's shirt pocket and (2) the black bag.[12] Wasef contends that the searches violated his Fourth Amendment rights and that the statements are fruits of those invalid searches. There is no dispute that the searches of Defendant's shirt pocket and the black bag were done without a warrant.

The government responds that this evidence should not be suppressed because (1) Defendant lacks standing to challenge the search of the black bag, (2) the searches were supported by probable cause, (3) the evidence found in Defendant's shirt pocket was found as the result of a frisk supported by reasonable suspicion, and (4) the evidence would have been inevitably discovered during inventory searches of Wasef and the vehicle. For the reasons set forth below, the Court concludes that the government has

---

[12] The motion also seeks to exclude statements made by Wasef after these allegedly unlawful searches occurred. Wasef's statements offered at trial are relevant only to the issue of his possession of the black bag. As discussed below in the Court's findings of fact, the Court finds that Wasef possessed the bag at least constructively in light of the fact that inside that bag was also his residential lease. The Court would reach the same conclusion regardless of whether it considered Wasef's statements to the officers after the search of his person.

proven by a preponderance of the evidence that officers would have inevitably discovered the evidence found in Wasef's shirt pocket and the black bag pursuant to inventory searches. As a result, the Court need not address the government's other arguments.

"The inevitable discovery doctrine is an exception to the exclusionary rule. The doctrine permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (internal quotation marks omitted). "[I]f the government can establish by a preponderance of the evidence that unlawfully obtained [evidence] 'ultimately or inevitably would have been discovered by lawful means,' the exclusionary rule will not" preclude the admission of evidence obtained in violation of the Fourth Amendment. *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). This doctrine reasons that exclusion of such evidence would "put the government in a worse position" than had the misconduct never occurred and would not properly serve any effort at deterrence. *Nix*, 467 U.S. at 444. The burden on the government, however, is difficult to meet. The inevitable discovery doctrine "requires that 'the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself.'" *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989) (quoting *United States v. Boatwright*, 822 F.2d 862, 864–65 (9th Cir. 1987)). Moreover, the Court's analysis must "involve[] no speculative elements, but [instead] focus[] on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5. Here, the government argues that officers would have inventoried all items found on Wasef's person and in the vehicle once they had probable cause to believe that the vehicle was stolen.

After arresting an individual, officers may lawfully search the arrestee's person and inventory all items found without first obtaining a warrant to do so. *See Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) ("[I]t is not 'unreasonable' [under the Fourth Amendment] for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with

11

established inventory procedures."); *Ruckes*, 586 F.3d at 717 (the search-incident-to-arrest doctrine "permits officers to search an arrestee's person subsequent to the arrest of that individual"). To demonstrate that the officers would have found the evidence in Defendant's shirt pocket, the government must prove by a preponderance of the evidence that they (1) would have lawfully arrested Wasef, and (2) would have subsequently searched and inventoried Wasef's person. The government met its burden on both issues. First, Seddon and Howard testified that when they come upon a potentially stolen vehicle, they detain the occupants until they can determine the status of the vehicle. If the vehicle is reported as stolen, the officers testified, they arrest the occupants. Here, regardless of whether Defendant was arrested—as opposed to merely detained—prior to the officers receiving Saadedin's report that the vehicle was stolen, Seddon and Howard's testimony demonstrate that they would not have allowed Wasef to leave prior to receiving that report, and that they would have arrested Wasef after receiving that report. Such an arrest would have been lawful. *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144–45 (9th Cir. 1998) (holding that an officer has probable cause to arrest the driver of a vehicle that has been reported stolen unless the driver offers "proof of ownership that would rebut the evidence that the vehicle had been stolen"). Second, Seddon testified that departmental policy calls for a personal inventory search of every arrestee. Nothing presented by either party suggested that Seddon would not have had Wasef's belonging inventoried after his arrest. In light of this evidence, the government has proven by a preponderance of the evidence that once the officers received Saadedin's report that his vehicle was stolen, they would have lawfully arrested and searched Wasef, and would have found the evidence in his shirt pocket.

The officers also would have inevitably discovered the contents of the black bag in Saadedin's vehicle. Seddon testified that when vehicles are impounded, officers engage in an inventory search of the vehicle and document all items found inside the vehicle. Here, the vehicle was towed after Wasef and Hoshang were arrested. Regardless of when the search of the vehicle actually occurred in this case, no evidence offered to the Court

suggests that the officers would not have inventoried the vehicle after Wasef's arrest.

In sum, the government has proven by a preponderance of the evidence that the officers would have lawfully (1) arrested Defendant and inventoried his belongings, and (2) impounded the vehicle and searched its contents. As a result, the government has met its burden in demonstrating that the evidence Defendant seeks to suppress would have been inevitably discovered through lawful means. The motion to suppress is therefore DENIED.

## II. Verdict

The Court has considered all of the evidence offered at trial. In light of the findings of fact set forth below, the Court concludes that the government has not proven beyond a reasonable doubt that Wasef is guilty of any of the eight counts of aggravated identity theft charged in the indictment.

### A. Findings of Fact

In the early morning of December 12, 2016, a resident of one of the apartment buildings at 5500 Clairemont Mesa Boulevard notified the San Diego Police Department that an individual was "casing" vehicles in a nearby parking lot. When officers arrived, Wasef and Hoshang attempted to avoid detection by lying down in the front seats of a vehicle parked in the same lot. The officers ordered Wasef and Hoshang out of the car. When Wasef exited the vehicle, he had in his pockets several credit cards, a check, and a driver's license belonging to J.N. The check in Wasef's pocket was the same check offered at trial as Government's Exhibit 2.[13] That check, which is made out to Wasef by Ramona High School, is counterfeit. In Wasef's shirt pocket were several credit cards

---

[13] Officer Howard testified that he found this check in the black bag. He apparently was mistaken. Smith's body camera video shows Smith looking at the check after taking items out of Wasef's pocket. Both parties agreed during closing argument that this check was found in Wasef's pocket, and not in the black bag.

and a driver's license. The driver's license offered at trial as Government's Exhibit 4,[14] which belongs to J.N. is the license that was found in Wasef's shirt pocket. The credit and debit cards offered at trial as Government's Exhibits 5 (MasterCard belonging to J.N.), 6 (Alaska Airlines Visa belonging to J.N.), 7 (Southwest Visa belonging to J.N.), 8 (Wells Fargo Debit Card belonging to J.N.), and 9 (Discover belonging to S.V.), were also in Wasef's pocket at the time. Wasef also had in his pocket four cards belonging to J.N. that were not credit cards: a DePuy Knee Replacement Patient I.D. Card, a card indicating that J.N. had a knee replacement and may activate a detection device, an AAA card, and a Costco card.[15]

Wasef was in possession of the black bag sitting in the back of Saadedin's vehicle. In that bag were several documents including (1) Wasef's residential lease, admitted as Government's Exhibit 18a, and (2) the check from the University of Vermont Medical Center, admitted as Government's Exhibit 3.

### B. Conclusions of Law

All eight counts in the indictment charge Wasef with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). That statute provides "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Section 1028(c) includes as an enumerated felony "any provision contained in this chapter (relating to fraud and false statements) other than this section or section 1028(a)(7)." *Id.* § 1028A(c)(4).

To find Wasef guilty of any of the charges in the indictment, the Court must

---

[14] The license is physically marked Exhibit 4. During the hearing, the government's attorney referred to the license as Exhibit 4A. (Trial Tr. at 73–74.) It appears this was a mistake: the plastic bag that contained all of the cards discussed at trial is marked as Government's Exhibit 4A.

[15] Unlike the credit and debit cards, these card were not individually marked. They were, however, offered inside the plastic bag offered by the government marked as Government's Exhibit 4A.

conclude that the government has proven beyond a reasonable doubt each element of the crime cited in that charge. *See In re Winship*, 397 U.S. 358, 364 (1970). To convict Defendant of any of the eight charges against him, the government therefore must have proven beyond a reasonable doubt that Wasef (1) knowingly transferred, possessed, or used a means of identification of another person without legal authority; (2) knew the means of identification belonged to a real person; and (3) did so in relation to committing the crime enumerated in that count. *United States v. Doe*, 842 F.3d 1117, 1120 (9th Cir. 2016).

### i. Counts One through Six

The first six counts relate to the credit cards found in Wasef's pocket. (ECF No. 1 at 1–3.) These counts accuse Wasef of knowingly transferring, possessing, or using, without lawful authority, a means of identification—which each count specifies as a particular credit card—"during and in relation to a felony violation of 18 U.S.C. § 1029." (*See id.*)

Section 1029 refers to "fraud and related activity in connection with access devices." Section 1029(a) makes unlawful ten different acts done in connection with access devices,[16] and Section 1029(b) makes it a felony to attempt to commit or conspire to commit any of those ten unlawful acts. Counts One through Six of the indictment in this case do not specify which of these ten acts the government claims Wasef committed, attempted to commit, or conspired to commit. (*See* ECF No. 1 at 1–3.) As a result, the Court must consider whether any of those ten acts apply to the facts of this case. The ten acts described in Section 1029(a) are as follows:

---

[16] "[T]he term 'access device' means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1). The Court assumes for that the credit and debit cards as well as the checks found on Wasef's person fall within this definition.

Whoever--

(1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices;

(2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;

(3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices;

(4) knowingly, and with intent to defraud, produces, traffics in, has control or custody of, or possesses device-making equipment;

(5) knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000;

(6) without the authorization of the issuer of the access device, knowingly and with intent to defraud solicits a person for the purpose of--

      (A) offering an access device; or

      (B) selling information regarding or an application to obtain an access device;

(7) knowingly and with intent to defraud uses, produces, traffics in, has control or custody of, or possesses a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications services;

(8) knowingly and with intent to defraud uses, produces, traffics in, has control or custody of, or possesses a scanning receiver;

(9) knowingly uses, produces, traffics in, has control or custody of, or possesses hardware or software, knowing it has been configured to insert or modify telecommunication identifying information associated with or contained in a telecommunications instrument so that such instrument may be used to obtain telecommunications service without authorization; or

(10) without the authorization of the credit card system member or its agent, knowingly and with intent to defraud causes or arranges for another person to present to the member or its agent, for payment, 1 or more evidences or records of transactions made by an access device;

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

18 U.S.C. § 1029(a).

As an initial matter, the Court must find that the government has not met its burden as to Count Five. That count charges Wasef with knowingly transferring, possessing, and using, without lawful authority, a Visa credit card with the last four digits 0790 and belonging to an individual with the initials K.A. (ECF No. 1 at 3.) No such credit card was offered into evidence, and no testimony during the trial discussed such a card. In other words, the government offered no evidence at trial that Wasef was ever in possession of a credit card with the last four digits 0790 or belonging to a person with the initials K.A. The government thus failed to meet its burden of Wasef's guilt as to Count Five.

The government did prove beyond a reasonable doubt that Wasef was in possession of the cards identified in Counts One, Two, Three, Four, and Six. But, as explained below, the government did not prove beyond a reasonable doubt that Wasef possessed these cards "during and in relation to" the commission, the attempted commission, or a conspiracy to commit any of the ten acts listed in § 1029(a). The Court will review the evidence at trial to ascertain whether it violates any of the ten prohibited acts.

First, Wasef did not produce, use, or traffic in (or attempt or conspire to produce, use, or traffic in) "one or more counterfeit access devices" in relation to his possession or use of the credit cards identified in Counts One through Six. *Id.* § 1029(a)(1). For purposes of § 1029(a), a counterfeit access device "means any access device that is counterfeit, fictitious altered, or forged, or an identifiable component of an access device or a counterfeit access device." *Id.* § 1029(e)(2). There was no evidence offered at trial suggesting that any of the credit cards in Wasef's possession were counterfeit.

Of course, the check from Ramona High School was counterfeit. But no evidence suggested that Wasef's possession or use of any of the credit cards (which displayed J.N.'s or S.V.'s names) was "in relation to" his creation and/or possession of the counterfeit Ramona High School check (which was written to Wasef himself). As noted

above, § 1028A(a)(1) requires the government to prove that Wasef's possession of the credit cards was "during *and in relation to*" the predicate felony. The only evidence offered by the government connecting the Ramona High School check with the credit cards was that Wasef possessed them at the same time. Wasef could not have used the credit cards in connection with the Ramona High School check, however, because these documents bore different names. Thus, while Wasef's concurrent possession of these documents might satisfy the "during" requirement of § 1028A(a)(1), it did not show any relation between the credit cards and the Ramona High School check. For the Court to give § 1028A(a)(1)'s "and in relation to" phrase any meaning—which it must, *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.")—it must require the government to prove more than just concurrent possession of such documents. *See United States v. Mendoza*, 11 F.3d 126, 129 (9th Cir. 1993) (holding that it was reversible error for a district court to omit "in relation to" from an instruction in a case involving 18 U.S.C. § 924(c)(1), which makes it unlawful to use or carry a firearm "during and in relation to" a crime of violence).

Second, the government did not prove that, in relation to his possession of the credit cards, Wasef trafficked or used (or attempted to or conspired to traffic or use) an unauthorized access device "during any one-year period, and by such conduct obtain[ed] anything of value aggregating $1,000 or more during that period." (emphasis added) *Id.* § 1029(a)(2). The only evidence about the use of any of the items discussed at trial was J.N.'s statement that some charges were made on her credit cards. (Trial Tr. at 101.) But J.N. did not state how many charges, or for what value, were made. As a result, no evidence was offered suggesting the amount of charges made on the credit cards totaled $1,000 or more.

Third, the government did not prove that, in relation to possessing the credit cards, Wasef possessed (or attempted or conspired to possess) "fifteen or more devices which are counterfeit or unauthorized access devices." *Id.* § 1029(a)(3). The total sum of items

discussed at trial was twelve: five credit or debit cards, one driver's license, four cards that were not credit or debit cards, and two checks. While Officer Howard briefly described finding "a lot of paperwork" and documents in the black bag belonging to someone other than Wasef or Hoshang, he did not indicate what those items were other than stating that there was "a check," which he identified later in his testimony as the Ramona High School check.[17] (*See* Trial Tr. at 44–47, 60–62.) Even assuming that all of these items qualify as "counterfeit or unauthorized access devices," the government did not prove that Wasef possessed fifteen or more such items.

Fourth, the government did not prove that in relation to possessing the credit cards, Wasef committed any prohibited act with any "device-making equipment." *Id.* § 1029(a)(4). Device-making equipment for purposes of § 1029 "means any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device." *Id.* § 1029(e)(2). No evidence offered at trial suggests that Wasef made the credit cards described in Counts One through Six, or that he ever had a device that could make such cards. As for the Ramona High School check, its counterfeit nature suggests that Wasef *might* at some point have been in possession of a device-making equipment. But the government did not offer sufficient evidence to prove beyond a reasonable doubt that Wasef was the creator of that check or was ever in possession of such equipment. And even if the government did make that showing, as discussed above, Wasef's creation of that counterfeit check was not in relation to his possession or use of the credit cards.

Fifth, the government did not prove that in relation to possessing the credit cards,

---

[17] During the trial, the government attempted to offer into evidence the black bag and all of its contents. (Trial Tr. at 51.) The Court suggested that the government first needed to mark each item inside the bag if those items were also going to be admitted. (*Id.* at 51–52.) After the discussion between the Court and parties that ensued, the government chose not to seek admission of the contents of the bag other than an item that was eventually excluded by the Court. (*Id.* at 52–54.) Thus, none of the items from the black bag—other than Wasef's residential lease and the University of Vermont Medical Center check— were admitted at trial.

Wasef effected transactions (or attempted or conspired to effect transactions) "to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000." *Id.* § 1029(a)(5). Again, the government offered no evidence suggesting the total value of the purchases made on J.N.'s cards was $1,000 or more.

Sixth, the government did not prove that in relation to possessing the credit cards, Wasef solicited (or attempted or conspired to solicit) "a person for the purpose of [] offering an access device; or [] selling information regarding or an application to obtain an access device." *Id.* § 1029(a)(6). No evidence offered at trial suggested that Wasef solicited any person to engage in any act, let alone for the purpose of offering an access device or selling the information on the cards or checks discussed at trial.

Seventh, the government did not prove that in relation to possessing the credit cards, Wasef committed any prohibited act with "a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications services." *Id.* § 1029(a)(7). Section 1029 adopts the definition of "telecommunications service" offered in "section 3 of title I of the Communications Act of 1934," *id.* § 1029(e)(9), which defines the same phrase as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53). The government offered no evidence that the cards or checks were modified or altered to obtain services from an entity offering telecommunications for a fee to the public.[18]

Eighth, the government did not prove that in relation to possessing the credit cards Wasef committed any prohibited act with "a scanning receiver." 18 U.S.C. § 1029(a)(8). A scanning receiver "means a device or apparatus that can be used to intercept a wire or electronic communication in violation of chapter 119 or to intercept an electronic serial

_____

[18] There was testimony that computer equipment was found in the vehicle, but the government did no offer evidence describing that equipment's uses or capabilities.

3:18-cr-01483-GPC

number, mobile identification number, or other identifier of any telecommunications service, equipment, or instrument." *Id.* § 1029(e)(8). The government offered no evidence that the cards or checks found in Wasef's possession can engage in any type of interception activity.

Ninth, the government did not prove that in relation to possessing the credit cards Wasef committed any prohibited act with "hardware or software, knowing it has been configured to insert or modify telecommunication identifying information associated with or contained in a telecommunications instrument so that such instrument may be used to obtain telecommunications services without authorization." *Id.* § 1029(a)(9). No evidence was offered suggesting the cards or checks were hardware or software that could be used to obtain telecommunications services.

Last, the government did not prove that in relation to possessing the cards Wasef caused or arranged (or attempted or conspired to cause or arrange) "for another person to present to [a] credit card system member or its agent, for payment, 1 or more evidences or records of transactions made by an access device." *Id.* § 1029(a)(10). A credit card system member "means a financial institution or other entity that is a member of a credit card system, including an entity, whether affiliated with or identical to the credit card issuer, that is the sole member of a credit card system." *Id.* § 1029(e)(7). For purposes of this ruling, the Court assumes that the operators of all six credit cards referenced in the indictment fit within the definition of a credit card system. But even so assuming, there was no evidence that Wasef caused or arranged the presentation of "1 or more evidences or records of transactions" made by those cards. Admittedly, it is not clear what Congress meant by the phrase "evidences or records of transactions." The phrase is not defined in Section 1028; in fact, the phrase is not repeated anywhere else in the United States Code. In addition, the Government has not offered an interpretation of this phrase. Ultimately, regardless of how the phrase is defined, the Government has failed to prove that Wasef caused or arranged "for another person" to present evidences or records of transactions to a credit card system.

In sum, because the government did not prove beyond a reasonable doubt that Wasef violated any of the ten subsections of 18 U.S.C. § 1029 during and in relation to his possession of the six credit and debit cards specified in Counts One through Six, the Court finds Wasef NOT GUILTY as to those counts.

## ii. Count Seven

Count Seven relates to the check issued by the University of Vermont Medical Center ("UVMC") found in the black bag in the back seat of Saadedin's vehicle. (ECF No. 1 at 3.) It accuses Wasef of knowingly transferring, possessing, and using, "without lawful authority, a means of identification of other person; specifically, a University of Vermont Medical Center check payable to T.N., in the amount of $1547.82, that he knew was issued to a real person, during and in relation to a felony violation of 18 U.S.C. § 1028." (ECF No. 1 at 3.) Similar to § 1029, § 1028 makes it unlawful to commit, attempt to commit, or conspire to commit several specific acts, which are listed in § 1028(a). *See* 18 U.S.C. §§ 1028(a), (f). And like Counts One through Six, Count Seven does not specify which act listed in § 1028(a) Wasef allegedly violated. As a result, the Court must again consider each of § 1028(a)'s subparagraphs, which provide:

> Whoever, in a circumstance described in subsection (c) of this section--
>
> (1) knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document;
>
> (2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority;
>
> (3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents;
>
> (4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States;
>
> (5) knowingly produces, transfers, or possesses a document-making implement or authentication feature with the intent such document-making

implement or authentication feature will be used in the production of a false identification document or another document-making implement or authentication feature which will be so used;

(6) knowingly possesses an identification document or authentication feature that is or appears to be an identification document or authentication feature of the United States or a sponsoring entity of an event designated as a special event of national significance which is stolen or produced without lawful authority knowing that such document or feature was stolen or produced without such authority;

(7) . . . ;[19] or

(8) knowingly traffics in false or actual authentication features for use in false identification documents, document-making implements, or means of identification;

shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 1028(a).

Before considering these provisions separately, it is important to note that the terms "identification document," "authentication feature," and "false identification document" in § 1028 refer to government-issued items intended or commonly used for purposes of identifying a person. Section 1028 defines "identification document" as:

a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals

18 U.S.C. § 1028(d)(3). An authentication feature is "any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing

_____

[19] As noted above, the aggravated identity theft statute excludes § 1028(a)(7) as a predicate felony. 18 U.S.C. § 1028A(c)(4).

23

authority[20] on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified." *Id.* § 1028(d)(1).  And a false identification document is:

> a document of a type intended or commonly accepted for the purposes of identification of individuals that--
>
> (A) is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and
>
> (B) appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international governmental or quasi-governmental organization

*Id.* § 1028(d)(4).

Because none of the credit or debit cards discussed at trial were (or were made to appear as if they were) issued by a government entity, they do not fall within the definitions of identification document, authentication feature, or false identification document.  Nor do the Ramona High School or UVMC checks fall within the statutorily-set definitions of these terms.  It is true that those checks were issued by governmental entities; that is to say, Ramona High School and UVMC appear to be public institutions.  But these checks, or the information on them, are not "of a type intended or commonly accepted for the purpose of identification of individuals." *Id.* at 1028(d)(3), (d)(4).  To the extent that the government claims that checks are intended or commonly accepted for purposes of identification of individuals, that fact would have had to have been proven at

---

[20] "[T]he term 'issuing authority'[] (A) means *any governmental entity or agency that is authorized to issue identification documents, means of identification, or authentication features*; and (B) includes the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international government or quasi-governmental organization." *Id.* § 1028(d)(6) (emphasis added).

trial.  *See, e.g.*, *United States v. Abbouchi*, 502 F.3d 850, 857 (9th Cir. 2007) (holding, in light of a Social Security Administration Agent's testimony that social security cards are commonly used for identification, that a social security card is an identification document under § 1028).  The Court cannot take notice of such a fact: it is most certainly subject to reasonable dispute.  *See* Fed. R. Evid. 201(b).  Thus, the *only* item discussed at trial that qualifies as an identification document, authentication feature, or false identification document is J.N.'s driver's license.

In light of the conclusion immediately above, it is clear that the government did not prove beyond a reasonable doubt that Wasef committed aggravated identity theft by transferring, possessing, or using, without lawful authority, the UVMC check during and in relation to any felony violations of § 1028.

First, the government did not prove beyond a reasonable doubt that in relation to his possession of the UVMC check, Wasef did, attempted to, or conspired to "knowingly and without lawful authority produce[] an identification document, authentication feature, or a false identification document." *Id.* § 1028(a)(1).  The term "produce" in this sense can be given three different relevant meanings, none of which are satisfied by the evidence at trial.  One relevant permissible construction of the term "produce" is the act of presenting or offering an item.  *See* Oxford English Dictionary 564 (2d ed. 1989) ("*OED*") ("To bring forward, bring forth or out; to bring into view, to present to view or notice; to offer for inspection or consideration, exhibit."); Black's Law Dictionary 1401 (10th ed. 2014) ("*Black's*").  Wasef did not present or offer J.N.'s driver's license to the officers.  Rather, it was found during a search of Wasef's shirt pocket.  A second relevant construction of the term produce is "[t]o bring into existence; to create." *Black's* at 1401. No evidence suggested that Wasef created J.N.'s driver's license.  Last, Section 1028 adds to the definition of produce the acts of "alter[ing], authenticat[ing], or assembl[ing]." *Id.* § 1028(d)(9).  No evidence suggested that Wasef altered, authenticated, or assembled J.N.'s driver's license.

Second, the government did not prove that in relation to his possession of the

25

UVMC check, Wasef knowingly transferred (or attempted or conspired to transfer) "an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). There was no evidence that Wasef conveyed J.N.'s license to anyone else. *See OED* at 395 ("Conveyance from one person to another of property . . ."); *Black's* at 1727 (same, or "[t]o sell or give"). Nor was there evidence that Wasef "select[ed] an identification document, false identification document, or document-making implement and plac[ed] or direct[ed] the placement of such . . . on an online location where it [wa]s available to others." 18 U.S.C. § 1028(d)(10).

Third, the government did not prove that in relation to his possessing the UVMC check, Wasef knowingly possessed (or attempted or conspired to possess) "with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents." *Id.* § 1028(a)(3). As discussed above, Wasef was in possession of just one such item: J.N.'s driver's license.

Fourth, the government did not prove that in relation to his possession of the UVMC check, Wasef knowingly possessed (or attempted or conspired to possess) "an identification document (other than those issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States." *Id.* § 1028(a)(4). There was no evidence offered at trial suggesting that Wasef was intending to use any of the items found in his possession to defraud the United States.

Fifth, the government did not prove that in relation to his possession of the UVMC check, Wasef knowingly produced, transferred, or possessed (or attempted or conspired to produce, transfer, or possess) a "document-making implement or authentication feature" intending to use it "in the production of a false identification document or another document-making implement or authentication feature which will be so used." *Id.* § 1028(a)(5). No evidence suggested that Wasef intended (or had capacity) to use the

information on J.N.'s driver's license to create a false identification document.

Sixth, the government did not prove that in relation to his possession of the UVMC check, Wasef knowingly possessed (or attempted or conspired to possess) "an identification document or authentication feature that is or appears to be an identification document or authentication feature of the United States or a sponsoring entity of an event designated as a special event of national significance which is stolen or produced without lawful authority." *Id.* § 1028(a)(6). While J.N.'s driver's license was stolen, it is not, and does not appear to be, "of the United States or an equivalent sponsoring entity of an event designated as a special event of national significance."

Last, there was no evidence that Wasef trafficked (or attempted or conspired to traffic) "in false or actual authentication features." *Id.* § 1028(a)(8). For purposes of § 1028, "traffic" means "(A) to transport, transfer or otherwise dispose of, to another, as consideration for anything of value; or (B) to make or obtain control of with intent to so transport, transfer, or otherwise dispose of." *Id.* § 1028(d)(12). No evidence suggested that anyone offered, or that Wasef solicited, consideration for Wasef's transportation, transfer, or disposal of J.N.'s driver's license.

In sum, the government failed to prove beyond a reasonable doubt that Wasef violated 18 U.S.C. § 1028A by transferring, possessing, or using the UVMC check in relation to a felony violation of 18 U.S.C. § 1028. As a result, the Court finds Wasef NOT GUILTY of the charge asserted in Count Seven.

### iii. Count Eight

Count Eight relates to the check from Ramona High School found in Wasef's pocket. (ECF No. 1 at 4.) It accuses Wasef of knowingly transferring, possessing, and using, without lawful authority "a means of identification of other person; specifically, the payor signature on a Ramona High School check in the amount of $792.36[], knowing that the signator was a real person, during and in relation to a felony violation of 18 U.S.C. § 1028(a)(3)," in violation of 18 U.S.C. § 1028(a)(1). (*Id.*)

Unlike the other charges in the indictment, Count Eight specifies the exact

statutory subprovision the government asserts Wasef violated in relation to his transferring, possessing, or using the Ramona High School check: 18 U.S.C. § 1028(a)(3). As discussed above, that provision makes it unlawful to "knowingly possess with the intent to use unlawfully or transfer unlawfully five or more identification documents . . . authentication features, or false identification documents." And as explained above, the government proved that Wasef was in possession of, at most, one identification document, authentication feature, and false identification document: J.N.'s driver's license. As a result, the government has failed to prove beyond a reasonable doubt that, in relation to transferring, possessing, or using the Ramona High School check, Wasef violated § 1028(a)(3). The Court therefore finds Wasef NOT GUILTY of the charge asserted in Count Eight.

### III.    Conclusion

For the reasons explained above, the Court DENIES Defendant's motion to suppress. The Court nonetheless finds Defendant NOT GUILTY of each count in the indictment in this case.

**IT IS SO ORDERED.**

Dated:  July 19, 2018

Hon. Gonzalo P. Curiel
United States District Judge